# In the United States Court of Federal Claims

No. 23-1155

Filed: December 13, 2023[†]

**SCOTT TECHNOLOGIES, INC.,**

   *Plaintiff*,

**v.**

**THE UNITED STATES,**

   *Defendant,*

**and**

**MSA SAFETY SALES, LLC,**

   *Intervenor-Defendant.*

*Eric S. Crusius,* with *Jeremy D. Burkhart* and *Kelsey M. Hayes*, Holland & Knight LLP, Tysons, Virginia, *Richard Ariel*, Holland & Knight LLP, Washington, D.C., for Plaintiff.

*Miles Jarrad Wright*, Trial Attorney, with *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, *Steven J. Gillingham*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., *Lawrence M. Anderson*, Trial Attorney, AF/JACQ Commercial Litigation Field, U.S. Air Force, for Defendant.

*Amy Laderberg O'Sullivan*, with *Cherie J. Owen, Michael E. Samuels, Isaac D. Schabes*, and *Sarah F. Burgart*, Crowell & Moring LLP, Washington, D.C., for Intervenor-Defendant.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**

---

[†] This Order was originally filed under seal on November 28, 2023, (ECF No. 38). The Court provided parties the opportunity to review this Opinion for any proprietary, confidential, or other protected information and submit proposed redactions. The proposed redactions were filed on December 12, 2023, (ECF No. 40), and are accepted by the Court. Thus, the sealed and public versions of this Opinion differ only to the extent of those redactions, a scrivener's error, the publication date, and this footnote.

This bid protest considers whether the United States Air Force ("Air Force") erred when it awarded MSA Safety Sales, LLC ("MSA"), a firm-fixed-price contract for next generation self-contained breathing apparatus. Disappointed offeror, Scott Technologies, Inc., who does business as 3M Scott Fire and Safety ("Scott"), challenges the United States on five main grounds, whether the Air Force: (1) failed to evaluate MSA's self-identified risks and proposed mitigation thereby unreasonably evaluating MSA's Chemical, Biological, Radioactive, and Nuclear ("CBRN") Chemical Warfare Component ("CWC") Design Approach; (2) unreasonably assigned a strength to MSA's Program Production Plan; (3) conducted unequal discussions and engaged in disparate treatment among offerors; (4) failed to comply with the Solicitation's evaluation criteria regarding Scott's Program Production Plan; and (5) conducted a flawed source selection determination. Scott seeks declaratory relief providing that the Air Force's award lacks a rational basis and is otherwise unreasonable, arbitrary and capricious, and contrary to applicable law and regulation. Lastly, Scott requests a permanent injunction to prevent MSA from commencing performance, to re-open discussions with offerors in the competitive range, and to make the Air Force reevaluate proposals.

The Court determines that the Air Force reasonably reviewed proposals and determined its award decision based on a best value tradeoff. Accordingly, the Court denies Scott's Motion for Judgment on the Administrative Record, (Pl.'s MJAR, ECF No. 30), and grants the United States' and MSA's Cross-Motions for Judgment on the Administrative Record, (Def.'s xMJAR, ECF No. 32; Int.-Def.'s xMJAR, ECF No. 31).

## I. Background

The procurement involves a single firm-fixed-price requirements-type contract for next generation self-contained breathing apparatus, specifically, Commercial Self Contained Breathing Apparatus ("SCBA") airpacks, commercial off the shelf ("COTS") masks, CWC masks with CBRN modification abilities, and Supplied-Air Respirator ("SAR") kits. (Administrative Record "AR" 442).[1] These devices protect emergency responders fighting fires from hazardous gases and smoke, and respiratory protection in chemical, biological, radiation, and nuclear environments. (*See* AR 282, 297). The Solicitation[2] sought to award the contract for a one-year base period with four one-year option periods. (*Id.*). The Solicitation also stated the Air Force would make a single award based on a best-value tradeoff. (AR 513). It explained that the Air Force would evaluate the value of proposals based on three factors: Technical (including both Technical and Technical Risk), Small Business Participation, and Price. (AR 514). The Solicitation stated that Technical and Technical Risk would hold equal importance, but together were "significantly more important than Price" and Small Business Participation would not be included in the tradeoff decision. (*Id.*).

---

[1] Citations to the record in this opinion are from the Administrative Record, (ECF Nos. 25–28). These citations refer to the appendix paginations provided to the Court, (ECF No. 24-1). Thus, the Court will cite to the record using "(AR __)."

[2] Solicitation No. FA8534-20-R-0006.

Factor 1—Technical/Risk—would consist of four subfactors: Field Evaluation, Certifications and Test Data, CBRN CWC Design Approach, and Program Production Plan. (AR 514–15). Each Technical subfactor would hold equal importance and receive both Technical and Technical Risk Ratings. (AR 515). The Air Force assigned each subfactor "Technical Ratings" ranging from Unacceptable to Outstanding based on the strengths and deficiencies of an offeror's proposal. (AR 515–16). The Air Force also reserved the right to "give positive consideration for performance in excess of threshold requirements, up to the objective requirements," but give "no further considerations" for "performance in excess of the objective requirements." (AR 515). The Air Force assigned each subfactor "Technical Risk Ratings" based on the identification of weaknesses and "degree to which an offeror's proposed approach for the requirements of the solicitation may cause disruption of schedule, degradation of performance, the need for increased government oversight, and/or the likelihood of unsuccessful contract performance." (AR 516). The Technical Risk Ratings would range from Low to Unacceptable. (AR 516–17).

Subfactor 1, Field Evaluation, evaluated whether an offeror's proposal and submitted SCBA units met or exceeded Solicitation requirements. (AR 515). Subfactor 2, Certifications and Test Data, determined whether the offeror provided requisite certifications and test data, and clearly demonstrated an understanding of the United States' needs. (*Id.*).

Subfactor 3, CBRN CWC Design Approach, assessed whether an offeror's proposal identified an acceptable design approach, satisfied or exceeded all CWC-specific requirements identified in Section 3 of the Purchase Description, "including, but not limited to: 'operating requirements (3.4.1.3), wearability (3.4.2.2 and 3.4.2.3), continuous flow requirements (3.4.7.1), drinking capability (3.6.9), comfort and fit requirements (3.4.2.5, 3.4.2.6, and 3.6.8), system weight requirements (3.4.3.1), protection requirements (3.7.4, 3.7.5 and 3.7.6), and filter requirements (3.8).'" (*Id.*) (emphasis removed). The Purchase Description further stated that pre-award, the Air Force would use technical reports to evaluate CWC masks, and post-award, would use testing to determine compliance with CWC requirements. (AR 661).

Subfactor 4, Program Production Plan, assessed whether an offeror identified a "sound and feasible plan for the organization of personnel, facilities, equipment, plant layout, and material resources" and demonstrated a clear level of knowledge to either meet or exceed the United States' needs. (AR 515). Per month, the Solicitation required delivery of 681 SCBA units, 673 commercial facepieces, 351 CWC facepieces, and twelve SAR kits. (AR 450–53). However, the Solicitation also stipulated that "[o]fferors may propose a shorter duration for delivery and may propose a higher output per month, and such will be incorporated into any resultant contract award." (AR 472) (emphasis removed).

Factor 2—Small Business Participation—assessed if the offeror's proposal provided an adequate approach to meeting the Small Business Program's objectives the Air Force assigned a rating of either Acceptable or Unacceptable. (AR 517). Factor 3—Price—was evaluated by Total Evaluated Price ("TEP") which assessed the proposal's reasonableness and balance among the price of one or more contract line-item numbers ("CLIN"). (AR 518).

In response to the Solicitation, four offerors including MSA and Scott, submitted initial proposals and were included in the competitive range. (*See generally* AR 3148–4249).[3] During discussions with MSA, the Air Force noted that offerors may propose a shorter duration for delivery and higher output per month under Subfactor Four, and explicitly required MSA to "annotate" its proposal as applicable. (AR 3548). The Air Force also sought to clarify if ▉▉▉ proposed delivery under Subfactor Four would meet the Solicitation's delivery requirement. (AR 3399).

The Air Force evaluated each offeror's final proposal on the factors and subfactors detailed above. (AR 6739–40). For Subfactor 1, MSA and Scott both received three strengths and no weaknesses. (AR 6720–23). The Air Force did not assign any strengths or weaknesses to MSA and Scott under Subfactor 2; each proposal was "rendered equal among all offerors." (AR 6725–27). For Subfactor 3, MSA received two strengths and no weaknesses, and Scott received three strengths and no weaknesses, (AR 6730–34). For Subfactor 4, the Air Force assigned one strength and no weaknesses to MSA and no strengths or weaknesses to Scott. (AR 6735–37). The Air Force summarized the relevant evaluations in the following chart:

| Offeror | Technical/Technical Risk Ratings | TEP | Reasonable/Balanced |
|---|---|---|---|
| ▉▉▉ | ▉▉▉ | ▉▉▉ | ▉▉▉ |
| MSA | Subfactor One: Blue – Outstanding/Low<br>Subfactor Two: Green – Acceptable/Low<br>Subfactor Three: Blue – Outstanding/Low<br>Subfactor Four: Purple – Good/Low | $72,595,901 | Yes/Yes |
| Scott | Subfactor One: Blue – Outstanding/Low<br>Subfactor Two: Green – Acceptable/Low<br>Subfactor Three: Blue – Outstanding/Low<br>Subfactor Four: Green – Acceptable/Low | $83,850,829 | Yes/Yes |

(AR 6739–40).

Following the final evaluation, the Air Force determined that MSA's proposal, which also was the lowest price, offered the best overall value and formally awarded the contract to MSA on March 15, 2023. (AR 6739–42, 7166–69, 7171–7217, 7329). After notifying failed offerors, the Air Force debriefed Scott, and subsequently, Scott filed an unsuccessful protest with the Government Accountability Office ("GAO"). (AR 7339–50, 7358–7402, 7407–11, 7472–

---

[3] MSA filed a pre-award protest with the Government Accountability Office ("GAO") challenging the Air Force's interpretation of the weight requirement for SCBA and CWC mask systems. (AR 4250–4627). The Air Force took corrective action, and the GAO dismissed the protest. (AR 4630–74).

4

12741). Scott filed its Complaint with this Court on July 26, 2023. (Compl., ECF No. 1). The parties filed cross-motions for judgment on the administrative record. This matter is now fully briefed and ripe for a decision on the merits.

## II.     Analysis

When the Court hears a bid protest, it "appl[ies] the appropriate [Administrative Procedure Act ("APA")] standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985). Under the APA, "[i]n a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial." *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013). Therefore, the Court must determine whether "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009)).

To determine whether the agency's action was arbitrary or capricious, the Court may not substitute its own judgment, but rather determine whether the action was "legally permissible, reasonable, and supported by the facts." *UnitedHealth Mil. & Veterans Servs., LLC v. United States*, 132 Fed. Cl. 529, 551 (2017); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The standard is "highly deferential" because "[p]rocurement officials have substantial discretion to determine which proposal represents the best value for the government" particularly in the "minutiae of the procurement process[.]" *Weeks Marine, Inc*, 575 F.3d at 1368; *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996). The APA standard "requires that the agency not only have reached a sound decision, but have articulated the reasons for that decision." *In re Sang Su Lee*, 277 F.3d 1338, 1342 (Fed. Cir. 2002) (internal citation omitted). If the agency's action fails under this standard, the Court determines if the "bid protester was prejudiced by that conduct." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005). To establish prejudice, the plaintiff must show "that there was a 'substantial chance' it would have received the contract award but for the [agency's] errors." *Id.* at 1353; *see Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (stating protestor bears burden of proof in negotiated procurement bid protest).

Where parties move for judgment on the administrative record, RCFC 52.1 provides a procedure to seek the equivalent of an expedited trial on a "paper record, allowing fact-finding by the trial court." *Bannum, Inc.*, 404 F.3d at 1356. The Court can resolve questions of fact by referencing the administrative record because genuine issues of material fact do not preclude judgment on the administrative record. *Id.* at 1355–56. Further, the Court "will not put words in an agency's mouth or invent supporting rationales the agency has not itself articulated" because it is bound to the administrative record. *ENGlobal Gov't Servs., Inc. v. United States*, 159 Fed. Cl. 744, 764 (2022) (quoting *IAP Worldwide Servs. v. United States*, 159 Fed. Cl. 265, 286 (2022)). Therefore, the Court is wary of "any rationale that departs from the rationale provided at the time the procuring agency made its decision." *Sys. Stud. & Simulation, Inc. v. United States*, 152 Fed. Cl. 20, 32 (2020) (quoting *Raytheon Co. v. United States*, 121 Fed. Cl. 135, 158 (2015), *aff'd* 809 F.3d 590 (Fed. Cir. 2015)).

Scott challenges the Air Force's evaluation and award decision as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. First, Scott argues that the Air Force failed to evaluate MSA's self-identified risks and proposed mitigation resulting in an unreasonable evaluation of MSA's proposed CBRN CWC Design Approach. (Pl.'s MJAR at 19–28). Second, Scott argues the Air Force unreasonably assigned MSA a strength for Program Production Plan, thereby increasing its adjectival rating. (*Id.* at 28–33). Third, Scott argues that the Air Force engaged in unequal discussions resulting in unequal treatment among offerors. (*Id.* at 34–37). Fourth, Scott argues the Air Force failed to properly consider its Program Production Plan. (*Id.* at 38–40). Finally, Scott argues the source selection decision was arbitrary and capricious because the underlying evaluations and ratings were flawed. (*Id.* at 40–41). The United States and MSA disagree with each claim; the Court also disagrees.

    A. *The Air Force's evaluation of MSA's self-identified risks and proposed mitigation under Subfactor 3 was not flawed.*

Scott argues that the Air Force failed to evaluate MSA's identified risks and mitigation strategies leading to a flawed evaluation of MSA's CBRN CWC Design Approach. (Pl.'s MJAR at 19–28). Specifically, Scott contends that the Air Force did not even consider two of MSA's medium risks despite the Solicitation requiring the evaluation to address self-identified risks and mitigation strategies, and document manageability (*Id.* at 21 (citing AR 516), 24–27). Scott contends the documentation failure undermines MSA's "Outstanding/Low" rating because MSA's CWC Design did not conform to specific Purchase Description requirements. (*Id.* at 24–28). Scott contrasts that alleged lack of documentation with the Air Force's evaluation of ▮▮▮▮▮, which assessed the manageability of ▮▮▮▮▮ risks and mitigation strategies. (*Id.* at 21–22 (citing AR 6438–39, 6494–95)). Scott also argues that the Solicitation required the Air Force to independently evaluate each offeror's risks and document its analysis. (*Id.* at 23). Scott contends that the Air Force's documentation and evaluation failures were prejudicial, and MSA's proposal should have received a lower technical rating or higher technical risk rating, altering the "most advantageous overall" analysis. (*Id.* at 24, 27–28).

The United States argues[4] that analyses of the two MSA's medium risks were "subsumed within the Air Force's overall evaluation of the CWC design." (*Id.* at 30 (citing AR 6610–15, 65913 (*sic*), 36–38).[5] The United States also argues it treated MSA and ▮▮▮▮▮ alike and was

---

[4] The United States asserts at length that Scott "essentially argues" two of MSA's medium risks were linked to design failures and insufficient testing and the United States demonstrates why those arguments are unavailing. (Def.'s xMJAR at 26–28, 33–36). Scott rejects the United States' framing, claiming that the argument "sets up a straw man by mischaracterizing [Scott's] objection[.]" (Pl.'s Resp. at 11–12, ECF No. 33). The Court will not wade into this disagreement, it will only address the actual language in Scott's motion.

[5] Scott replied that the United States' argument was "never before raised (even at GAO)" and labeled it "novel[.]" (Pl.'s Resp. at 9). This is irrelevant. The Court is not bound by GAO decisions, and it follows that the parties are not bound to arguments advanced before the GAO either. *ENGlobal Gov't Servs., Inc.*, 159 Fed. Cl. at 771 (citing *Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1327 (Fed. Cir. 2011)).

responsive to the design proposed by each offeror. (*Id.* at 38–39). The United States further contends that even if there was an error, it was harmless because the Air Force's action was rational. (*Id.* at 40). For its part, MSA argues that even though the Air Force did not discuss each risk individually, the Air Force considered MSA's proposed mitigation strategies. (Int.-Def.'s xMJAR at 21 (citing *Interspiro, Inc. v. United States*, 72 Fed. Cl. 672, 678 n.18 (2006) ("The court also notes that the fact that the Air Force did not discuss each of the risks identified by MSA does not mean that the Air Force failed to consider them."), *aff'd*, 227 F. App'x 924 (Fed. Cir. 2007))). MSA continues that the technical ratings themselves are reasonable and complied with evaluation criteria, and that the Air Force's evaluation of ▮▮▮▮ was tailored to its proposed mitigation. (*Id.* at 26–32). MSA concludes that Scott suffered no prejudice. (*Id.* at 33–34). The Court agrees with the United States and MSA.

The Air Force is required to evaluate all proposals based on the requirements of the Solicitation. *See* FAR 15.305(a) ("An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation."). If the Air Force failed to follow the terms of its own Solicitation, then the source selection decision lacks a rational basis. *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004), *aff'g* 56 Fed. Cl. 377 (2003). Here, to assign Technical Risk ratings the Solicitation required the Air Force to "address . . . offeror's identified risks and proposed mitigation" and "document why that is or is not manageable[]" for each technical subfactor. (AR 516). Therefore, the Court must determine whether the Air Force sufficiently documented MSA's self-identified risks and mitigation strategy and incorporated that into its Technical Risk rating. *See Weeks Marine, Inc.*, 575 F.3d at 1358 (requiring the Court to find whether the decision lacked a rational basis or violated regulation or procedure).

Scott is primarily challenging the evaluation and documentation of two of MSA's self-identified risks. (Pl.'s MJAR at 21). The first risk is "[t]he failure of apparatus at CBRN" which could lead to "potential permeation of CWC [air purifying respirator ("APR")] configurations to higher concentrations." (AR 6211). Scott argues this risk implicates and fails to satisfy Purchase Description requirements, including design (3.1),[6] operating requirements (3.4.1.3),[7] and

---

[6] Purchase Description 3.1, Design provides—in relevant part— that "[t]he CWC mask and accessories shall provide continuous protection against vapor, aerosol, particulate, and liquid threat agents for [six] hours (threshold) with a [sixteen] hours (objective)." (AR 664).

[7] Purchase Description 3.4.1.3, CWC Mask Performance, provides that "[t]he CWC mask shall be designed to provide an integrated filtered respiratory protection system for the user in a CBRN environment. The system must be capable of providing a compressed air supply for interior or exterior firefighting related operations and a CWC included filtered air system for CBRN operations and other forms of hazardous material threats. Transition from compressed breathing air (SCBA) to filtered air (APR) must not expose the user to inhalation, absorption, or ingestion contamination. In a CBRN environment, when operating in the filtered air mode, the SCBA shall always have APR capability." (AR 666).

continuous flow requirements (3.4.7.1).[8] (*Id.* at 25–26 (citing AR 4642, 6211)). Scott also contends that the Air Force did not consider such failures and insufficiently documented MSA's proposed solution. (*Id.* at 19–28). However, Scott's argument fails to engage with the record.

First, MSA provided a clear mitigation strategy to address potential permeation. MSA proposed to "[r]e-evaluate design, determine point of entry and redesign component(s)" to ensure compliance with design, operating, and continuous flow requirements. (AR 6164, 6211). For the CWC facepiece's SCBA and APR use, MSA planned to "combin[e] proven design elements from the ▇▇▇▇▇▇▇▇▇▇ with a modified version of MSA's CBRN approved ▇ ▇▇▇▇▇▇▇▇▇▇." (*Id.*). MSA continued that by "[c]ombining these field-proven designs" the facepiece would satisfy the "necessary performance, comfort and durability needed when facing adverse environments." (*Id.*). When evaluating MSA's proposal, the Air Force directly engaged with these proposed solutions. (*See e.g.,* AR 6588, 6612–15, 6625). Although Scott is correct that the Air Force did not designate a specific section to MSA's risk matrix, the Air Force evaluated MSA's compliance with Purchase Description requirements in detail.

For example, the Air Force stated that in a CBRN environment, MSA's proposed mask would protect users from vapor, aerosol, particulate, and liquid threat agents with NIOSH CBRN SCBA and APR standards for six hours, directly complying with design (3.1) and APR (3.4.7.1) requirements. (AR 664, 6623). Scott seemingly overlooks this finding because it is under mask protection (3.7.4), not a separate risk matrix section. (AR 6623). However, Scott's argument is a matter of substance over form. *See e.g., Blue Origin Fed'n, LLC v. United States*, 157 Fed. Cl. 74, 90 (2021) (rejecting argument elevating form over substance). The Air Force documented MSA's compliance with the substance of Purchase Description's design and APR requirement, thereby determining potential permeation was manageable. As the United States convincingly argues, the Air Force's analysis of MSA's risks and proposed solutions is woven throughout its evaluation. (Def.'s xMJAR at 30). The Court finds agency action to be arbitrary and capricious only if the agency "entirely failed to consider" something, which they did not do here. *See Ala. Aircraft Indus. Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) ("Courts have found an agency's decision to be arbitrary and capricious when the agency 'entirely failed to consider an important aspect of the problem[.]'" (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43)).

Similarly, the Air Force documented that MSA's system for CBRN operations would provide continuous protection, even when "transitioning from compressed breathing air (SCBA) to filtered air (APR)." (AR 6612). The Air Force analyzed MSA's air flow schematics and concluded that MSA's system could protect users from inhalation, absorption, or ingestion of contamination as well as from other hazardous material threats. (AR 6612–13). The Air Force also accepted MSA's "detailed narrative describing how the proposed ▇▇▇▇▇▇▇

---

[8] Purchase Description 3.4.7.1, Air Purifying Respirator (APR), provides that "[t]he APR shall be tested and designed to operate with C2A1 filters. The overall APR weight with C2A1 filter(s) installed shall comply with industry standards. The APR with filter shall provide continuous protection against vapor, aerosol, particulate, and liquid threat agents. The APR shall be designed in a way that the wearer shall not be exposed to inhalation, absorption, or ingestion contamination when transitioning from SCBA to APR mode." (AR 668).

would meet continuous flow requirements." (AR 6613). MSA's CWC mask was determined to be wearable "during extended missions" in chemical environments for forty-eight continuous hours. (AR 6613). Such documentation contravenes Scott's argument that the Air Force "failed to evaluate *or even consider*" MSA's risks under Subfactor 3. (Pl.'s MJAR at 21 (emphasis in original)).

The second risk at issue is the potential for MSA's CWC APR to fail the National Fire Protection Association ("NFPA") heat and flame test because the proposed configuration "has not been tested to the NFPA heat and flame tests[.]" (*Id.*). Scott argues this risk implicates CWC mask comfort (3.4.2.5),[9] operating requirements (3.4.1.3), and facepieces (3.6.4)[10] requirements. (*Id.* at 26–27 (citing AR 4644–45, 4647)). Because the parties did not challenge that those Purchase Description requirements are at issue, (Pl.'s Resp. at 15–18, ECF No. 33), the Court will address those requirements. Again, Scott fails to address the substance of the Air Force's evaluation.

MSA proposed to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ to reduce their burn compliance and meet NFPA requirements. (AR 6211, 6625). The Air Force documented this and stated that MSA's CWC facepiece "provides a rugged design to meet NFPA requirements, specifically incorporating materials that perform when exposed to high heat and flame, as well as chemical contaminants." (AR 6185). The Air Force continued that "[a]ll materials used on the APR assembly are fire resistant and were chosen to meet or exceed [the NFPA tests]." (*Id.*). It concluded that "the proposed shroud and location meets the NFPA [test] and is determined to meet the Purchase Description paragraph requirements." (AR 6625). Such language demonstrates the Air Force accepted MSA's solution, indicating the risk was manageable.

Further, for mask comfort, Scott asserts that because MSA's CWC mask and components were not tested, it was "at risk of failing these tests," thereby violating the Purchase Description requirements. (Pl.'s MJAR at 26). This argument is speculative. If the Court accepts Scott's argument, MSA would be held to a higher standard than the Solicitation required because the Solicitation did not require the offerors to subject masks to the NFPA's heat and flame test prior to award. (AR 4644–45). Doing so would depart from the Solicitation's stated criteria. *L-3 Commc'ns EOTech, Inc. v. United States*, 83 Fed. Cl. 643, 653 (2008) (agencies "do not have the discretion to announce in the solicitation that one plan will be used and then follow another in the actual evaluation.") (internal citation omitted). As stated above, FAR 15.305(a) requires an agency to evaluate competitive proposals based "solely on the factors and subfactors specified in the solicitation." Here, the Solicitation did not require pre-award testing. (AR 669). The Air

---

[9] Purchase Description 3.4.2.5 CWC Mask Comfort, provides that "[t]he CWC mask and components shall minimize heat retention, fatigue, chafing, pinching, binding, fogging, and physical pressure on skin from wear. The CWC mask in APR mode shall permit personnel to sleep while wearing the mask." (AR 667).

[10] Purchase Description 3.6.4 Facepieces, provides that "[b]oth the SCBA and CWC facepiece lens(es) shall meet all NFPA, OSHA, and NIOSH standards for construction, field of view, and fire and scratch resistance. A damaged facepiece lens shall have the capability of being changed at the user level." (AR 669).

Force documented its belief that MSA's facepiece would meet or exceed the heat and flame tests. (AR 6185). That is sufficient.

Second, the Air Force was not required to use any "magic words" regarding manageability during its evaluation. *See IAP World Servs., Inc. v. United States*, 152 Fed. Cl. 384, 405 (2021) (not requiring the United States to use magic words when awarding contract so long as requisite analysis performed). The Solicitation merely required that the Air Force "document"[11] why a mitigation was or was not manageable. (AR 516). Therefore, it is enough that the Air Force recorded how MSA satisfied Purchase Description requirements in its proposal, indicating potential risks were manageable. (AR 6612–15).

Third, MSA's CWC Design conformed to Purchase Description requirements justifying its "Outstanding/Low" rating. In bid protests, the Court's role is to determine whether the officials evaluated the proposals and explained a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). As explained above, the Air Force sufficiently considered and documented risks and proposed solutions throughout its analysis of MSA's compliance with Purchase Description requirements. It follows that Scott fails to bear the heavy burden of showing that the Air Force's award decision lacked that rational connection. *See id.*; *Banknote*, 365 F.3d at 1351. Therefore, MSA's "Outstanding/Low" rating for its CWC CBRN Design Approach was reasonably assigned.

Fourth, Scott's comparison between the Air Force's analysis of MSA's and ▓▓▓ risks is unavailing. Scott argues that the Air Force "addressed ▓▓▓ identified risks and proposed mitigations, documented why these risks were or were not manageable, it inexplicably failed to do the same when evaluating MSA's proposal." (Pl.'s MJAR at 22). Again, Scott overlooks substantive analysis of MSA's proposal. As explained above, the Air Force addressed how MSA's CBRN CWC Design Approach and proposed solutions met the Purchase Description requirements. The Air Force used the same language to evaluate whether ▓▓▓ risks and proposed mitigations were manageable. For example, the Air Force stated that ▓▓▓ ▓▓▓ (AR 6495 (emphasis added)). Because the Air Force consistently used this language to determine if the proposals satisfied the Purchase Description requirements, the Court is unpersuaded by Scott that the Air Force erred in this regard. (*See e.g.*, AR 6495, 6625).

Finally, even if the Air Force did not extensively document those Purchase Description requirements listed above, the Solicitation does not require the Air Force to provide an in-depth evaluation of each risk and proposed mitigation. (*See* AR 516). The Court agrees with MSA that Scott confuses a broad documentation requirement with the requirement that the Air Force

---

[11] To "document" means "to record something in the form of a written document, photograph, film, etc." *Document*, OxfordLernersDictionaries.com, https://www.oxfordlearnersdictionaries.com/us/definition/English/document_2 (last visited Oct. 28, 2023); *see also Bear Mountainside Realty LLC v. United States*, 168 Fed. Cl. 179, 204 (2023) (analyzing definition of "document").

individually address each risk and mitigation strategy. (Int.-Def.'s xMJAR at 26–29); *see also Bear Mountainside Realty LLC*, 168 Fed. Cl. at 204. As stated above, the Solicitation merely required the Air Force to acknowledge the risks and proposed mitigation manageability. (*Id.*). Those requirements were met. Because Scott failed to demonstrate that the Air Force insufficiently evaluated and documented MSA under Subfactor 3, the Court will not evaluate prejudice. *Bannum, Inc.*, 404 F.3d at 1353.

> B. *The Air Force's evaluation of MSA's proposal under Subfactor 4 complied with the Solicitation.*

Scott argues the Air Force unreasonably assigned MSA a strength for its Program Production Plan. (Pl.'s MAR at 28–33). Scott contends the Air Force relied on undisclosed evaluation criteria because MSA received a strength for "exceeding" delivery requirements. (*Id.* at 29–30). Scott believes this was improper because Subfactor 4 was focused on an offeror's plan for the organization resources, not monthly production capacity. (*Id.*). Scott analogizes MSA's strength to instances when agencies improperly applied unstated criteria during procurement. (*Id.* at 30–31 (citing *Jacobs Tech., Inc. v. United States*, 100 Fed. Cl. 186, 191–94 (2011), *Lab'y Corp. of Am. Holdings v. United States*, 116 Fed. Cl. 643 (2014))). Scott argues it was not "on notice" that the Air Force would reward offerors for exceeding monthly delivery outputs and that Scott was prejudiced by the Air Force's evaluation. (*Id.* at 32–33).

For its part, the United States argues the Air Force used stated evaluation criteria to award MSA a strength for its Program Production Plan. (Def.'s xMJAR at 41–46). Specifically, the United States argues that the ability to meet or exceed the delivery schedule was either explicitly or intrinsically included in the Solicitation. (*Id.* at 41–43). The United States also distinguishes this action, arguing that offerors were on notice that they could propose a faster delivery schedule. (*Id.* at 44–46). MSA also argues that the Air Force did not rely on unstated evaluation criteria to award MSA's strength. (Int.-Def.'s xMJAR at 34–40). MSA asserts the Solicitation stated that the Air Force reserved the right to consider whether an offeror exceeded requirements and did so here in compliance with Subfactor 4. (*Id.* at 35–37). MSA further argues Scott was "on notice" that the Air Force could evaluate program production plans based on a monthly delivery basis. (*Id.* at 38). The Solicitation language supports the United States' and MSA's arguments.

As an initial matter, it is undisputed that the Air Force could consider whether an offeror's proposed Program Production Plan exceeded requirements.[12] (Pl.'s MJAR at 30; Def.'s xMJAR at 42–43; Int.-Def.'s xMJAR at 36). Scott challenges the scope of Subfactor 4, not the Air Force's ability to assign strengths. (Pl.'s MAR at 28–33). Agencies are given discretion to determine the scope of evaluation criteria. Specifically, the Court has held that "a solicitation need not identify criteria intrinsic to the stated evaluation factors, and agencies retain great discretion in determining the scope of a given evaluation factor." *Summit Techs., LLC v. United*

---

[12] The Solicitation provided that when assigning technical factor ratings, the Air Force "reserves the right to give positive consideration for performance in excess of threshold requirements, up to the objective requirements, when specified" and that "[n]o further considerations will be given for performance in excess of the objective requirements." (AR 515).

11

*States*, 151 Fed. Cl. 171, 180 (2020) (quoting *PlanetSpace, Inc. v. United States*, 92 Fed. Cl. 520, 536 (2010)).

Under Subfactor 4, the Solicitation stated requirements were met "when the proposal identifies a sound and feasible plan for the organization of personnel, facilities, equipment, plant layout, and material resources, and all the information clearly demonstrates a level of knowledge and understanding of the requirement that meets, or exceeds the requirements in a way beneficial to the Government." (AR 515). Scott contends that the evaluation criteria turns on how the offeror intended to organize and plan for production, not consider production output. (Pl.'s MJAR at 30 (citing AR 515)). This is unavailing.

The Court applies the same principles governing contract interpretation to analyze the terms of a solicitation. *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997–98 (Fed Cir. 1996) (applying principles governing contract interpretation with "equal force" to interpretation of solicitations). "An interpretation that gives meaning to all parts of the contract [or solicitation] is to be preferred over one that leaves a portion of the contract [or solicitation] useless, inexplicable, void, or superfluous." *Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326, 1343–44 (Fed. Cir. 2021). Therefore, Subfactor 4's stated evaluation criteria do not exist in a vacuum, the criteria are part of the Solicitation as a whole. *Gardiner, Kamya & Assocs., P.C. v. Jackson*, 467 F.3d 1348, 1353 (Fed. Cir. 2006) (internal quotation marks and citation omitted) (The Court "must interpret [the solicitation] as a whole" and in a manner that gives reasonable effect "to all parts and avoids conflict or surplusage of its provisions.").

Here, offerors were required to submit their proposals in compliance with Format and Specific Content requirements. (AR 510–12). Under Subfactor 4, that section requires "a detailed and comprehensive discussion on how the offeror intends to organize its personnel, facilities, equipment, plant layout, and material resources *to ensure a complete and timely production flow and delivery schedule for this effort*[.]" (AR 512 (emphasis added)). Such language mimics the evaluation criteria listed above but includes the purpose of the offeror's Production Plan. (AR 512, 515). When giving "equal force" to all parts of the Solicitation, it follows that the Air Force would consider an offeror's production flow and delivery schedule when evaluating Program Production Plans. *Safeguard Base Operations, LLC*, 989 F.3d at 1343–44; *Banknote Corp. of Am., Inc.*, 365 F.3d at 1353 ("[W]e must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions.") (Internal citations omitted)).

The stated Solicitation requirements are distinguishable from *Jacobs Technology* and *Laboratory Corporation*. 100 Fed. Cl. at 191–94; 116 Fed. Cl. 643. In *Jacobs Technology*, the agency did not reasonably notify offerors it would evaluate proposals based on achieving "full operating capacity" relative to a target date when the Solicitation did not even include a schedule requirement. 100 Fed. Cl. at 191–94. Similarly, in *Laboratory Corporation*, the agency used the number of federal supply schedule ("FSS") contracts listed by offerors as a "critical element" in evaluating proposals even though neither the Solicitation nor Statement of Work listed FSS contracts as an evaluation criterion. 116 Fed. Cl. at 650–51. Here however, the Solicitation clearly listed the required production output and timeframe for each delivery, (AR 450–53 (schedule requiring delivery of 681 SCBA units, 673 commercial facepieces, 351 CWC facepieces, and twelve SAR kits every thirty calendar days)); it also notified offerors multiple

times that it would give "positive consideration" to proposals that exceeded Solicitation requirements. (See *e.g.,* AR 515). Therefore, Scott fails to demonstrate it was not "on notice" that the Air Force would reward offerors for exceeding monthly delivery outputs. Accordingly, the Air Force's strength award to MSA was consistent with the stated evaluation criteria.

### C.  *The Air Force conducted equal discussions and treated offerors equally.*

Scott argues the Air Force impermissibly favored MSA over other offerors, creating unequal discussions and disparate treatment. (Pl.'s MJAR at 34–37). Specifically, Scott argues that the Air Force violated FAR 15.306(e)(1) when it "induced MSA to propose a higher delivery output during discussions[.]" (*Id.* at 34). Scott argues its own proposed Program Production Plan also indicated its ability to exceed the Solicitation's estimated production requirements, so it was improper for the Air Force to direct MSA to update its final proposal. (*Id.* at 35–36). Scott contends this resulted in disparate treatment because MSA received a strength for its capacity to meet demand surges, and the Air Force later relied on that output as "the sole discriminator in selecting MSA as the awardee[.]" (*Id.* at 34, 36–37).

The United States counters that although the Air Force's discussions were not identical, they were not unequal. (Def.'s xMJAR at 46–51). The United States argues the Air Force tailored its discussions to each offeror's proposal which were not substantively indistinguishable. (*Id.* at 46–50). The United States also notes that while MSA's initial proposal clearly demonstrated its ability to exceed minimum delivery requirements, Scott's initial proposal— without further calculations—simply met minimum production demands. (*Id.*). MSA similarly argues the Air Force did not "induce" MSA to propose higher delivery outputs in its final proposal. (Int.-Def.'s xMJAR at 40–43). Rather, discussion differences arose because of differences in MSA's and Scott's proposals, specifically how directly each addressed their ability to exceed minimum delivery requirements. (*Id.* at 44–47). MSA concludes that the strength awarded to MSA's Program Production Plan was not the result of disparate treatment. (*Id.* at 47– 48). The Court agrees with the United States and MSA that the Air Force did not favor MSA over other offerors and Scott was not subject to unequal discussions and disparate treatment.

In negotiated procurements, the United States must hold "tailored" discussions with each offeror in the competitive range, FAR 15.306(d)(1), but may not engage in conduct that "[f]avors one offeror over another." FAR 15.306(e)(1). During those discussions, the United States "may engage in a wide range of exchanges with offerors in order to facilitate the evaluation process and to permit the agency to make an informed award decision." *Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 714 (2010), *abrogated on other grounds by Safeguard Base Operations, LLC*, 989 F.3d at 1326. Because "[t]he primary objective of discussions is to maximize the Government's ability to obtain best value, based on the requirement and the evaluation factors set forth in the solicitation[,]" FAR 15.306(d)(2), the Court has rejected "perfect parallelism" in those discussions. *CRAssociates, Inc. v. United States*, 105 Fed. Cl. 698, 715–16 (2011) (collecting cases). Therefore, the Air Force enjoyed a level of discretion when engaging in discussions with MSA and Scott.

First, the Air Force did not "induce" MSA to propose a higher delivery output during discussions. As the United States and MSA point out (and Scott even concedes), MSA already proposed higher outputs per month in its initial proposal without the Air Force's prompting.

13

(Def.'s xMJAR at 47; Int.-Def.'s xMJAR at 42; Pl.'s MJAR at 35 ("[MSA's] production quantities are greater than the [Air Force's] estimated quantities in the Solicitation."). MSA initially stated it "has adequate facilities, production capacity, suppliers, personnel, and programs to support the [Air Force] requirement of up to ▇ SCBA per month, ▇ facepieces per month, ▇ CWC facepieces per month, and ▇ SAR kits per month[.]" (AR 2247).[13] MSA's initial proposed deliveries exceeded the Solicitations requirements: 681 SCBA airpacks, 673 SCBA facepieces, 351 CWC facepieces, and twelve SAR kits per month. (AR 450–53). Therefore, the record does not support Scott's argument that the Air Force "induced" MSA to propose a higher delivery output during discussions, MSA had already done so.

Second, the Air Force did not engage in unequal discussions when it directed MSA to annotate the higher output in its final proposal. "Unequal discussions are those which prejudicially favor one offeror over another, such as where an agency provides one offeror a 'crucial' or 'advantageous' piece of information during discussions, but does not provide the same to another offeror." *XPO Logistics Worldwide Gov't Servs., LLC v. United States*, 134 Fed. Cl. 783, 800 (2017) (citing *DMS All-Star Joint Venture v. United States*, 90 Fed. Cl. 653, 672 (2010)). Here, the Air Force did not hide the ball from Scott. The Solicitation itself required offerors to "annotate" whether its proposed delivery could exceed this minimum requirement. (AR 472). Specifically, the Solicitation stated, "Offerors may propose a shorter duration for delivery and may propose a higher output per month, and such will be incorporated into any resultant contract award. *Any proposed shorter duration and/or higher output per month shall be annotated under the applicable CLIN under 'Proposed Delivery.'*" (*Id.* (emphasis added)). Therefore, the Air Force did not provide "crucial" information to MSA or prevent Scott from annotating its own proposal. *See XPO Logistics Worldwide Gov't Servs.*, 134 Fed. Cl. at 800. The Air Force merely reiterated an applicable Solicitation requirement. (AR 472, 3548).

Scott also argues the Air Force engaged in unequal discussions because its own initial proposal "similarly noted its ability to deliver[] higher production quantities than the [Air Force's] estimate." (Pl.'s MJAR at 35). However, Scott discounts the differences between its own and MSA's initial proposals. (*See id.*). Here, MSA clearly listed its capacity for a higher output per month. (AR 2247). Comparatively, Scott provided a "▇▇▇▇▇▇▇▇▇," that "[i]t ▇▇▇▇▇▇▇"[14] and that Scott based its production schedule on the delivery requirements. (AR 2601, 2604). Scott's proposal lacked MSA's clarity regarding its capacity to exceed output minimums. (*See* AR 2601, 2604).

Furthermore, Scott asserts the Air Force overlooked its repeated "capacity for surge requirements." (Pl.'s MJAR at 35–36). Scott highlights two instances where Scott touted its capability and capacity to handle surge requirements. (*Id.* (quoting AR 2586, 2588)). But again, such language does not clearly indicate Scott's Program Production Plan proposed shorter

---

[13] In its final proposal. MSA increased these figures to ▇ SCBAs, ▇ facepieces, ▇ CWC facepieces, and ▇ SAR kits per month. (AR 4043).

[14] Scott calculated that it could produce ▇ SCBAs and over ▇ masks per month. (Pl.'s MJAR at 35 n.5).

14

duration and/or higher output per month. Unlike MSA's proposal, Scott did not provide concrete figures demonstrating how it exceeded the Program Production Plan requirements, (AR 2247); Scott just stated it could handle surge requirements. (AR 2586, 2588). Accordingly, the Air Force was not required to treat MSA and Scott the same during discussions. FAR 15.306(d)(1) ("Discussions are tailored to each offeror's proposal, and must be conducted by the [CO] with each offeror within the competitive range.").

Third, the Air Force did not engage in disparate treatment when it awarded MSA a strength for its increased output. To succeed on its disparate treatment claim, Scott must show the Air Force either: (1) "unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals[,]" or (2) "inconsistently applied objective solicitation requirements between it and other offerors, such as proposal page limits, formatting requirements, or submission deadlines." *Office Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020) (internal citations omitted). Here, Scott failed to demonstrate either requirement.

As stated above, MSA and Scott's proposal were not nearly identical. (AR 2247, 2601, 2604). MSA's proposal clearly stated it could exceed the delivery minimums whereas Scott's required the Air Force to perform additional calculations. (*Id.*). The Air Force also did not inconsistently apply objective solicitation requirements. The Solicitation clearly stated its minimum production requirements and MSA clearly exceeded them. Scott did not. Therefore, Scott was not subject to disparate treatment. *See Perspecta Enter. Sols. LLC v. United States*, 151 Fed. Cl. 772, 788 (2020) (finding that because "the offerors did not submit identical proposals, the Agency necessarily entered into different—but not unequal—discussions regarding those proposals."). Accordingly, Scott was not subject to unequal discussions and disparate treatment.

D.  The Air Force reasonably evaluated Scott's proposal under Subfactor 4.

Scott argues the Air Force unreasonably evaluated its Program Production Plan because it did not receive any strengths. (Pl.'s MJAR at 38–40). Scott directly compares the Source Selection Evaluation Board's findings for itself and MSA and argues similar language is evidence that aspects of its plan also have merit or exceed Solicitation requirements. (*Id.*). Scott also attempts to shoehorn in its earlier argument that the Air Force used unstated criteria to evaluate Subfactor 4. (*Id.* at 40). The United States argues the Air Force exercised its considerable discretion when it did not award Scott a strength for its domestic production and material sourcing as well as for its Program Production Plan chart. (Def.'s xMJAR at 51–53). MSA contends that Scott is merely disagreeing with the Air Force's reasoned judgment and the Court should not second-guess the technical evaluation. (Int.-Def.'s xMJAR at 48–51). The Court agrees with the United States and MSA.

When making best value determinations, procurement officials have "substantial discretion," particularly regarding technical ratings "involv[ing] discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss Co.*, 77 F.3d at 449. Agency officials enjoy "broad discretion to weigh an offeror's strengths and weaknesses as it sees fit." *Tetra Tech, Inc. v. United States*, 137 Fed. Cl. 367, 386 (2017). Protestors cannot merely present the Court with the same information that was before the agency and hope for a different determination, for "[e]ven if the Court possessed the technical expertise to offer its own

15

judgment, the Court lacks the authority to do so," under its highly deferential standard of review. *Digiflight, Inc. United States*, 167 Fed. Cl. 158, 167 (2023) (quoting *Tech. Innovation All. LLC v. United States*, 149 Fed. Cl. 105, 174 (2020)). Here, Scott merely presents the Court with sections of its proposed Program Production Plan and hopes the Court will find that aspects of its proposal have merit or exceed the Air Force's requirements "in a beneficial way." (Pl.'s MJAR at 38–40). But this is not the role of the Court. The Court simply reviews agency action to determine if "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001) (internal citation omitted). Because the Air Force documented why Scott met Solicitation requirements, (AR 6697–6701), the Court is satisfied.

Further, Scott's comparison between its proposal and MSA's is meritless because neither offeror received a strength on the grounds presented. (Pl.'s MJAR at 38–39 (*comparing* AR 6634–36, *with* AR 6698–99). Specifically, Scott highlights that both offerors had multiple United States facilities which would ease production and material sourcing, both aspects of Subfactor 4. (*Id.*). But Subfactor 4 did not require domestic production or sourcing. (AR 515). Therefore, the Court will not second-guess the Air Force's determination that those facilities did not warrant a strength. *See E.W. Bliss Co.*, 77 F.3d at 449. For the foregoing reasons, Scott does not demonstrate that the Air Force unreasonably failed to assign a strength to its Program Production Plan.

### E. The Air Force's Source Selection Decision was rational.

Scott argues the source selection decision was irrational because the Air Force relied on evaluation errors, argued above, in its best-value tradeoff determination. (Pl.'s MJAR at 40–41). The United States and MSA disagree. (Def.'s xMJAR at 53–55; Int.-Def.'s xMJAR at 51–56). As does the Court.

Scott has not established that the Air Force conducted a flawed source selection determination. The Court grants "an even greater degree of discretion" to the agencies in best value determinations between comparably competent offerors. *Glenn Defense Marine (ASIA), PTE Ltd.*, 720 F.3d at 908. The Court cannot substitute its own judgment for that of the agency. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. As detailed above, the Air Force properly considered both Scott's and MSA's proposals to make the source selection decision. Accordingly, the Air Force's source selection decision was rational, well-documented, and in accordance with the law.

### F. Scott failed to satisfy the requirements for injunctive relief.

Scott seeks an injunction to permanently stop MSA's performance of the contract and require the Air Force to reevaluate offerors' proposals. (Pl.'s MJAR at 2, 41–45). For the Court to grant injunctive relief, the plaintiff must succeed on the merits of the case. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004) (explaining that to issue permanent injunction, the court must consider whether (1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief.). Scott fails on the merits, so the Court is unable to award injunctive relief and need not analyze the remaining factors for injunctive relief. *Int'l Res.*

*Recovery, Inc. v. United States*, 64 Fed. Cl. 150, 164 (2005) ("A plaintiff that cannot show that it will actually succeed on the merits of its claim cannot prevail on its motion for injunctive relief.").

### III.     Conclusion

Accordingly, the Court **DENIES** Scott's Motion for Judgment on the Administrative Record, (ECF No. 30), and **GRANTS** the United States' and MSA's Cross-Motions for Judgment on the Administrative Record, (ECF Nos. 31, 32).

The parties shall meet and confer and file a joint status report proposing redactions to this memorandum opinion by **December 12, 2023**, to allow the Court to file a public version of the opinion.

The Clerk is **DIRECTED** to enter judgment for Defendants. Each party shall bear their own costs.

**IT IS SO ORDERED.**



s/     David A. Tapp
DAVID A. TAPP, Judge